## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| **BOBBY BANKS, TIMOTHY DOGAN, ZANGERIO DOGAN, WILLIAM FRAZIER, ERIC GOMEZ, RICHARD PHILLIPS, ARIC RILEY, CHRISTOPHER ROBERTS, VAN RODEN, RICKY ROMINES, LARRY SANDERS, EMMANUEL STALLWORTH, SHUN THOMAS, ARTHUR VARDAMAN, SHELDON WATTS, and MARCUS SIMPSON,** | **Case No. 1:14-cv-00398-LG-RHW** |
| **Plaintiffs,** | |
| **v.** | |
| **DIRECTV, LLC and MULTIBAND CORP.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## <u>SECOND AMENDED COMPLAINT</u>

Plaintiffs Bobby Banks, Timothy Dogan, Zangerio Dogan, William Frazier, Eric Gomez, Richard Phillips, Aric Riley, Christopher Roberts, Van Roden, Ricky Romines, Larry Sanders, Emmanuel Stallworth, Shun Thomas, Arthur Vardaman, Sheldon Watts, and Marcus Simpson by and through their undersigned counsel, for their individual complaints against DIRECTV LLC ("DIRECTV"); and Multiband Corp., ("Provider Defendant" or "HSP Defendant") (collectively with DIRECTV, "Defendants"); hereby state as follows:

**NATURE OF SUIT**

1.      DIRECTV—the largest provider of satellite television services in the United States—is responsible for a far reaching "fissured employment"[1] scheme.   In order to expand and service its customer base (topping more than 20 million domestic subscribers), DIRECTV has engaged tens of thousands of technicians—including each of the Plaintiffs in this case—to install and repair its satellite systems. Although DIRECTV requires these technicians to drive a DIRECTV-branded vehicle, wear a DIRECTV uniform, and perform their work according to DIRECTV's exacting policies and procedures, DIRECTV disclaims any legal relationship with these workers, tagging them instead as "independent contractors" or employees of subordinate entities (including the named service provider Defendant). But it is the economic reality of the relationship—not DIRECTV's self-serving labels—that controls whether Plaintiffs meet the definition (among the broadest ever legislated) of an "employee" under the Fair Labor Standards Act ("FLSA").

2.      Plaintiffs' claims squarely challenge this dangerous trend, and are not the first to do so. The U.S. Department of Labor ("DOL") has made a priority of investigating and exposing multi-party business arrangements that shirk compliance with the FLSA.  *See* http://wage-hour.net/post/2012/09/25/Fissured-Industry-Enforcement-Efforts-

---

[1] Fissured employment describes the practice of a large company attempting to shed its role as a direct employer and purporting to disassociate itself from the workers responsible for its products (albeit maintaining tight control over the method, manner, quantity, and quality of production). The practice of outsourcing an employer's responsibilities and obligations to subordinate entities and subcontractors is highly profitable for companies like DIRECTV, but results in stagnation of wages and benefits and causes rampant violations of wage-and-hour laws. *See e.g.*, David Weil, *The Fissured Workplace: Why Work Became So Bad for So Many and What Can Be Done to Improve It* (Harvard Univ. Press, Feb. 3, 2014);  David Weil, *Enforcing Labour Standards in Fissured Workplaces: The US Experience*, 22 Econ. & Lab. Rel. Rev. 2, at 33-54 (July 2011).

Continue.aspx (last visited Feb. 25, 2015).  The DOL's Misclassification Initiative, launched under Vice President Biden's Middle Class Task Force, is aggressively combating this pervasive issue in order to restore rights denied to individuals.[2]  In September 2011, then-Secretary of Labor Hilda L. Solis announced the signing of a Memorandum of Understanding between the DOL and the Internal Revenue Service (IRS), under which the agencies combine resources and share information to reduce the incidence of misclassification of employees, to help reduce the tax gap, and to improve compliance with federal labor laws. The DOL's Wage and Hour Division is also partnering with individual states whose workers are being subjected to this practice.[3]

3.      The individual Plaintiffs joined herein intend to prove in this litigation that they are legally employed by DIRECTV and, where applicable, Multiband, and are entitled to the overtime and minimum wage protections of the FLSA.

---

[2] "The misclassification of employees as something else, such as independent contractors, presents a serious problem, as these employees often are denied access to critical benefits and protections—such as family and medical leave, overtime compensation, minimum wage pay and Unemployment Insurance—to which they are entitled. In addition, misclassification can create economic pressure for law-abiding business owners, who often struggle to compete with those who are skirting the law. Employee misclassification also generates substantial losses for state Unemployment Insurance and workers' compensation funds."      *See*      http://www.dol.gov/opa/media/press/whd/WHD20120257.htm (last visited Feb. 25, 2015); *see generally*, DOL Misclassification Initiative, available at http://www.dol.gov/whd/workers/misclassification/ (last visited Oct. 9, 2014).

[3] *See, e.g.*, DOL Misclassification Initiative, *available at* http://www.dol.gov/whd/workers/misclassification/#stateDetails (last visited Feb. 25, 2015).

**JURISDICTION AND VENUE**

4.     The FLSA authorizes court actions by private parties to recover damages for violation of the FLSA's wage and hour provisions. Jurisdiction over Plaintiffs' individual FLSA claims is based on 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

5.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims alleged herein occurred in this judicial district and Defendants are each subject to personal jurisdiction in this district.

**PARTIES**

6.     Bobby Banks is an individual residing in Port Gibson, Mississippi.

7.     Timothy Dogan is an individual residing in Jackson, Mississippi.

8.     Zangerio Dogan is an individual residing in Memphis, Tennessee.

9.     William Frazier is an individual residing in Millington, Tennessee.

10.    Eric Gomez is an individual residing in Hernando, Mississippi.

11.    Richard Phillips is an individual residing in Coldwater, Mississippi.

12.    Aric Riley is an individual residing in Madison, Mississippi.

13.    Christopher Roberts is an individual residing in Hattiesburg, Mississippi.

14.    Van Roden is an individual residing in Gulf Port, Mississippi.

15.    Ricky Romines is an individual residing in Brandon, Mississippi.

16.    Larry Sanders is an individual residing in Pearl, Mississippi.

17.    Emmanuel Stallworth is an individual residing in Moss Point, Mississippi.

18.    Shun Thomas is an individual residing in Mobile, Alabama.

19.    Arthur Vardaman is an individual residing in Ridgeland, Mississippi.

20.    Sheldon Watts is an individual residing in Huntsville, Alabama.

21.     Marcus Simpson is an individual residing in Courtland, Mississippi.

22.     DIRECTV, Inc. is a Delaware corporation with its principal place of business in El Segundo, California. DIRECTV, Inc. does business as DIRECTV Home Services. In December 2011, DIRECTV, Inc. merged with another DIRECTV entity, DIRECTV Operations, LLC. The resulting entity is known as DIRECTV, LLC, which is a Delaware corporation with its principal place of business in El Segundo, California.

23.     Defendant Multiband Corp. ("Multiband") is a Minnesota corporation, with its principal place of business in New Hope, Minnesota.

24.     All Plaintiffs performed work for DIRECTV and, where applicable, the named Provider Defendant in Mississippi.

25.     All Defendants do business or have done business in Mississippi.

## COMMON FACTUAL ALLEGATIONS

### DIRECTV's Fissured Employment Scheme: The Provider Network

26.     At all relevant times, Plaintiffs worked as satellite television installation technicians. Plaintiffs' principal job duty as technicians was to install and repair DIRECTV satellite television service.

27.     DIRECTV controls and manages its nationwide corps of service technicians in two ways: (1) by directly employing service technicians ("W-2 Employees"); and (2) through an employment network of service providers (the "Provider Network") consisting of Home Service Providers, including Multiband, ("HSPs"), Secondary Service Providers ("Secondary Providers"), subcontractors, and service technicians.

28.     DIRECTV operates its Provider Network nationwide from its headquarters in El Segundo, California.

29.     Upon information and belief, at all relevant times, DIRECTV was the primary, if not the only, client of the HSPs and Secondary Providers (HSPs and Secondary Providers are collectively referred to herein as "Providers") and was the source of substantially all of each Provider's income.

30.     During the relevant time period, and as alleged in more detail *infra*, many HSPs were subsumed by DIRECTV through a series of mergers and acquisitions.

31.     By design, the Provider Network is organized and operated as a top-down structure: DIRECTV sits atop the Provider Network, controlling the employment network through contracts with HSPs and Secondary Providers; the HSPs and Secondary Providers, in turn, enter contracts with a patchwork of largely captive entities that DIRECTV generally refers to as subcontractors; and the subcontractors enter contracts with the technicians who install the satellite television equipment. In some instances, the HSPs or Secondary Providers contract directly with the technicians.

32.     Multiband performed similar, middle-management functions between DIRECTV and those technicians described below as being employed by Multiband under the FLSA. In this role, Multiband worked directly in the interest of DIRECTV by passing along scheduling from DIRECTV and providing supervision of the respective technicians. That is, DIRECTV set forth the qualification "hiring" criteria for the employees and contractors of Multiband. Multiband then implemented and enforced those qualifications. Similarly, DIRECTV set the requirements for how the technicians were to perform their work. In turn, Multiband monitored and enforced compliance with those requirements.

33.     Multiband maintained, among other documents, a contractor file for each technician working under their aegis as an ostensible independent contractor (though,

these technicians were actually "employees" under the FLSA). The contents of these contractor files were regulated and audited by DIRECTV. These contractor files are analogous to a personnel file.

34.     Multiband had the power to enter into and terminate contracts with the independent contractor working under their aegis. In this way, Multiband had the power to hire and fire those technicians.

35.     Multiband maintained warehouses and other facilities where independent contractor working under their aegis had to go to pick up certain equipment and receive certain trainings. The equipment belonged to DIRECTV and the trainings were required by DIRECTV.

36.     No matter how employed, whether directly or as part of the Provider Network, each DIRECTV technician must install DIRECTV's satellite television equipment according to the same policies, procedures, practices, and performance standards as required by DIRECTV.

37.     For those technicians who work as part of the Provider Network, DIRECTV's policies, procedures, practices, performance standards, and payment method requirements are described, mandated, and imposed through the Provider Agreements, Secondary Provider Agreements, and Services Provider Agreements.

38.     DIRECTV obligates the Providers to ensure that the technicians perform their work as specified by the Provider Agreements, and, accordingly, the Subcontractor Agreements and Technician Agreements incorporate the provisions of the Provider Agreements.

39.    The Provider Agreements enable DIRECTV to control nearly every facet of the technician's work, down to the "DIRECTV" shirts they are required to wear and the "DIRECTV" ID card they must show customers.

40.    DIRECTV assigns each technician a scope of work described in a work order that DIRECTV itself delivers to each technician via a centralized computer software system that DIRECTV controls.   DIRECTV mandates particularized methods and standards of installation to assure DIRECTV's equipment is installed according to the dictates of DIRECTV's policies and procedures. As a consequence, each technician's essential job duties are virtually identical no matter where performed and no matter which intermediary the technician is ostensibly working for.

41.    Plaintiffs typically started their workdays after receiving daily work schedules assigned through DIRECTV's dispatching systems. DIRECTV used a database program known as SIEBEL to coordinate the assignment of particular work orders to technicians using each technician's unique "Tech ID Number."

42.    After receiving their daily work schedules, Plaintiffs typically called the customer contact for each of their assigned jobs to confirm the timeframe within which the technician expected to arrive at the customer's home. Plaintiffs then traveled to their first assigned job and thereafter continued to complete the jobs assigned by DIRECTV in the prescribed order on the daily work schedule. Upon arriving at each job site, Plaintiffs were required to check-in by telephone with DIRECTV via its dispatching system. At the end of an assigned job, Plaintiffs were required to report to DIRECTV that the installation was complete and, thereafter, worked directly with DIRECTV employees to activate the customer's service.

43.     When performing DIRECTV's work, Plaintiffs were required to purchase and wear a uniform with DIRECTV insignia on it. Additionally, Plaintiffs were required to display DIRECTV insignia on vehicles driven to customers' homes for installations.

44.     Although DIRECTV controls nearly every aspect of the technicians' work, Defendants insist that the technicians are not their employees, claiming that in some instances they are "independent contractors."

45.     Plaintiffs will show that the Provider Network is purposefully designed to exercise the right of control over DIRECTV's technician corps while avoiding the responsibility of complying with the requirements of the FLSA.

**DIRECTV's Workforce Consolidation: Acquisition of Providers by Defendants**

46.     DIRECTV's control over its purportedly independent provider partners is integral to its fissured employment scheme. So much so that DIRECTV regularly infuses these partners with what it labels internally as "extraordinary advance payments" in order to keep their dependent operations afloat while feigning an outward appearance of independence. When litigation or other circumstances make the "independent" relationship a negative for DIRECTV, DIRECTV simply absorbs these entities by acquisition.

47.     The absorption by DIRECTV is seamless, simply a resetting of titles without the functional modifications that normally accompany an arm's length acquisition. To date, there are only three "independent" HSPs still in operation—including the named Provider Defendant. Since DIRECTV developed its HSP Network, DIRECTV or one of these three remaining HSPs has purchased at least thirteen prior HSPs.[4] Below is a description of the

---

[4] These include AeroSat, Bruister, Bluegrass Satellite and Security, ConnecTV, Directech NE, Directech SW, DTV Home Services II, LLC, Halsted Communications, Ironwood

prior HSPs for which the Plaintiffs technicians worked and how those HSPs were ultimately acquired by DIRECTV or Multiband.

**Directech SW**

48.    Upon information and belief, Multiband Corporation acquired Directech SW in December 2009, including all of its facilities. After the acquisition, Multiband Corporation conducted business out of Directech SW's locations, and personnel from Directech SW worked for Multiband Corporation. Many of Directech SW's employees were hired by Multiband Corporation.

49.    Upon information and belief, working conditions for installation technicians who worked for Directech SW remained substantially the same after Multiband Corporation acquired Directech SW. Likewise, technicians, including Plaintiffs, had substantially the same job(s) after Multiband Corporation acquired Directech SW. There were no broad changes to job functions, job titles, job responsibilities, and/or supervisors, and technicians' pay remained the same.

**JP&D Digital Satellite**

50.    Upon information and belief, DIRECTV acquired JP&D Digital Satellite in June 2010, including all of its facilities. After the acquisition, DIRECTV conducted business out of JP&D Digital Satellite's locations, and personnel from JP&D Digital Satellite worked for DIRECTV. Many of JP&D Digital Satellite's employees were hired by DIRECTV.

51.    Upon information and belief, working conditions for installation technicians who worked for JP&D Digital Satellite remained substantially the same after DIRECTV

---

Communications, JP&D Digital Satellite, Michigan Microtech, Mountain Satellite and Security, and Skylink.

acquired JP&D Digital Satellite. Likewise, technicians, including Plaintiffs, had substantially the same job(s) after DIRECTV acquired JP&D Digital Satellite. There were no broad changes to job functions, job titles, job responsibilities, and/or supervisors, and technicians' pay remained the same.

### The Economic Reality: DIRECTV Employ the Technicians through Its Provider Network

52.     DIRECTV exerts significant control over the Providers and Plaintiffs regarding the essential terms and conditions of Plaintiffs' employment.

53.     DIRECTV and the Provider Defendant are, and were at all times relevant herein, in the business of, among other things, providing satellite television service to businesses and consumers. Installation and repair of satellite dishes, receivers, and related equipment is an integral part of DIRECTV's business.

54.     An "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. § 203(d), and an employee may be employed by more than one employer at the same time. Employment status for purposes of wage and hour law is defined by the real economic relationship between the employer(s) and the employees. Here, through its Provider Network, DIRECTV establishes, defined, and controls the economic relationship between DIRECTV and its technicians. Among other indicia of employment described herein, DIRECTV controls the details of Plaintiffs' day-to-day work and the piece rate compensation method by which technicians are paid for their work.

55.     Through the Providers, DIRECTV exercises significant control over Plaintiffs' daily work lives, including, but not limited to, control over what work Plaintiffs performed,

where that work was performed, when that work was performed, and how that work was performed.

56.     Through the Providers, DIRECTV also determined whether Plaintiffs' work merited compensation. Among other controls, DIRECTV defined Plaintiffs' compensable and non-compensable work and imposed "rollbacks" and "chargebacks," thereby setting Plaintiffs' rate of pay on a piece-rate basis tailored to achieve its business purposes. Through the Provider Network DIRECTV utilized its Providers' payroll and paycheck systems to administer its piece-rate compensation scheme, including issuing paychecks to Plaintiffs.

57.     DIRECTV required Plaintiffs to hold themselves out as agents of DIRECTV.

58.     DIRECTV promulgates detailed instructions for how installations are to be completed. Plaintiffs received these instructions and performed the work as DIRECTV required. By requiring that Plaintiffs comply with DIRECTV's instructions, Plaintiffs were forbidden to exercise meaningful discretion in how they performed installations.

59.     DIRECTV publishes training materials that technicians such as Plaintiffs are required to review.

60.     DIRECTV requires that all technicians pass pre-screening and background checks, and obtain a certification from the Satellite Broadcasting & Communications Association ("SBCA") before that technician may be assigned DIRECTV work orders. This requirement allows DIRECTV to mandate certain training for all technicians.

61.     DIRECTV uses these requirements to control who is hired to install its systems.

62.     DIRECTV utilizes a network of quality control personnel and field managers to oversee the work performed by Plaintiffs.

63.     As described in detail above, DIRECTV, through its SIEBEL system, assigns detailed work schedules to Plaintiffs. Through this system, DIRECTV and the Providers effectively control who continues to perform their work, and can effectively terminate any technician by simply ceasing to issue work to those technicians.

64.     DIRECTV and Providers' quality control personnel reviewed Plaintiffs' work, and imposed chargebacks and/or rollbacks based on those reviews.

65.     Upon information and belief, DIRECTV required, through its Provider Network, technicians who were classified as 1099 independent contractors to sign "Subcontractor Agreements."

66.     Defendants are each engaged in interstate commerce and, upon information and belief, Defendants each gross more than Five Hundred Thousand Dollars in revenue per year.

67.     Defendants' policies and practices accomplish two, interrelated purposes: they ensure DIRECTV controls its technicians' work, while deliberately disclaiming their status as employees under state and federal employment laws.

68.     By imposing its policies and practices—and to mask the economic realities of its employment relationship with Plaintiffs—DIRECTV willfully fails to maintain time records and other employment documentation, thereby saving payroll and other costs. And by imposing its policies and practices to avoid the reach of state and federal employment laws, DIRECTV willfully fails to pay minimum wage and overtime compensation to Plaintiffs.

69.     Through the Provider Network, DIRECTV imposed its policies and practices uniformly, which created an economic reality driven by its control over Plaintiffs and their work, sufficient to establish that DIRECTV, and where applicable, Multiband, are Plaintiffs' employers subject to liability under the FLSA.

### The Piece-Rate System: DIRECTV's Unlawful Payment Scheme

70.     As with other aspects of Plaintiffs' work, DIRECTV effectively controlled Plaintiffs' pay through the common policies and practices mandated in its Provider Agreements.

71.     Every Plaintiff was paid pursuant to the piece-rate payment scheme that is utilized throughout DIRECTV's network.

72.     The FLSA permits employers to pay on a piece-rate basis as long as the employer pays for all hours worked, including non-productive hours, and pays a premium for hours worked over forty in a week, based on the employee's regular rate. See 29 U.S.C. § 207(a)(g); 29 C.F.R. 778.318(a).

73.     The employer and employee may agree, prior to work commencing, that the piece-rate pay includes pay for productive and nonproductive hours, but where there is no agreement, the FLSA is not satisfied. See 29 U.S.C. § 207(g) (employer's method for calculating the overtime premium must be made "pursuant to an agreement or understanding arrived at between the employer and the employee before performance of the work."); 29 C.F.R. 778.318(c) (where it is "understood by the parties that other compensation received by the employee is intended to cover pay for such hours" . . . . "[I]f that is the agreement of the parties, the regular rate of the piece worker will be the rate

determined by dividing the total piece work earnings by the total hours worked (productive and nonproductive) in the workweek.")

74.     There was no contract, memorandum, or other document between Plaintiffs and Defendants properly memorializing or explaining this pay system.

75.     Under this system, Plaintiffs were not paid for all hours they worked for Defendants. Rather, they were paid on a per-task (a/k/a piece rate) basis for satisfactorily completing a DIRECTV-approved satellite installation.

76.     The piece-rate system only pays technicians for certain enumerated "productive" tasks—tasks that DIRECTV listed on a standardized rate card—but fails to compensate technicians for all necessary work they perform.

77.     In addition to the certain tasks DIRECTV designated as compensable, Plaintiffs performed other work each week during the relevant time period for Defendants, such as assembling satellite dishes, driving to and between job assignments, reviewing and receiving schedules, calling customers to confirm installations, obtaining required supplies, assisting other technicians with installations, performing required customer educations, contacting DIRECTV to report in or activate service, working on installations that were not completed, and working on "rollback" installations where Plaintiffs had to return and perform additional work on installations previously completed.

78.     Plaintiffs were not paid for these integral and indispensable tasks that were necessary to their principal activity of installing and repairing DIRECTV satellite television service.

79.     Although Plaintiffs worked more than forty hours per week, as set forth in more detail below, they were not compensated for these "nonproductive" tasks.

Accordingly, to the extent W-2 technician Plaintiffs' pay was translated to a "regular rate" (as required by the FLSA for calculating overtime due to piece-workers), Plaintiffs' regular rate did not reflect compensation for all hours worked and they were not properly compensated for overtime hours, if at all.

80.     Defendants did not pay Plaintiffs' wages free and clear. Rather, Plaintiffs were subjected to "chargebacks" wherein Defendants would deduct amounts from Plaintiffs' pay if there were issues with an installation, or questions from the customer, generally up to 90 days after the customer's service was activated. The chargeback would occur for a variety of reasons, many of which were out of Plaintiffs' control, including, for example, faulty equipment, improper installation, customer calls regarding how to operate their remote control, or a customer's failure to give greater than a 95% satisfaction rating for the services provided by the technician.

81.     In addition to chargebacks, independent contractor Plaintiffs were also required to purchase supplies necessary to perform installations, such as screws, poles, concrete, and cables; and independent contractor Plaintiffs were also required to provide all maintenance and purchase all the gas used in the vehicle they drove between DIRECTV customers' homes. Nor were these independent contractors paid an overtime premium for work done beyond 40 hours in a workweek.

82.     These required business expenses were incurred for DIRECTV's financial benefit and reduced the wages of these technicians.

83.     Plaintiffs, in virtually every workweek, worked more than 40 hours per week for DIRECTV, as alleged in more detail below.

84.     Plaintiffs were not paid the overtime premium required by applicable law for work done beyond 40 hours in a given workweek.

85.     The policy and practice of imposing "chargebacks," failing to compensate Plaintiffs for all hours worked, and failing to reimburse Plaintiffs' necessary business expenses resulted in Plaintiffs routinely working more than forty hours in a work week while being denied overtime pay and being subjected to an effective wage rate below that required by applicable law.

86.     Plaintiffs intend to prove that DIRECTV's piece-rate pay system fails to comply with applicable law, and constitutes an effort to deliberately deny Plaintiffs earned wages and overtime compensation in violation of the FLSA.

## LITIGATION HISTORY

### *Lang v. DIRECTV*

87.     A number of Plaintiffs in this case, including Bobby Banks, Timothy Dogan, William Frazier, Eric Gomez, Richard Phillips, Christopher Roberts, Van Roden, Ricky Romines, Larry Sanders, Emmanuel Stallworth, Shun Thomas, Arthur Vardaman, and Sheldon Watts, previously opted in to a conditionally certified FLSA action pending in the Eastern District of Louisiana styled *Lang v. DIRECTV, et al.*, No. 10-1085-NJB.  The *Lang* case was pending as a collective action until the court, on September 3, 2013, granted the parties' joint motion decertifying the class, dismissed the opt-in plaintiffs' claims without prejudice to pursue the individual claims raised herein, and ordered the statute of limitations for each opt-in plaintiff to continue to be tolled for 60 days from the date of the order. *Lang v. DIRECTV*, Case No. 10-1085-NJB (E.D. La.) (Docs. 466, 466-1; Doc. 467, Order).

### *Acfalle v. DIRECTV*

88.    Within the 60 days granted by the *Lang* court, Plaintiffs Bobby Banks, Timothy Dogan, William Frazier, Eric Gomez, Richard Phillips, Christopher Roberts, Van Roden, Ricky Romines, Larry Sanders, Emmanuel Stallworth, Shun Thomas, Arthur Vardaman, and Sheldon Watts, and also Zangerio Dogan and Aric Riley, filed an action in the Central District of California on November 1, 2013. *Acfalle v. DirecTV*, Case No. 13-8108 ABC (Ex) (Doc. 1) (amended on December 23, 2013, by Doc. 9). On July 22, 2014, the court entered an order granting, in part, Defendants' Motions to Sever Claims of Plaintiffs. (Doc. 71) In that order, the court "dropped" 277 plaintiffs with FLSA-only claims, dismissing them without prejudice to refile their claims "where they performed their work." (Doc. 71, at 5, 8.)  The court tolled the statute of limitations for 90 days to permit Plaintiffs to refile their claims. (Doc. 71, at 8.)

89.    Within the 90 days granted by the *Acfalle* court, Plaintiffs Bobby Banks, Timothy Dogan, Zangerio Dogan, William Frazier, Eric Gomez, Richard Phillips, Aric Riley, Christopher Roberts, Van Roden, Ricky Romines, Larry Sanders, Emmanuel Stallworth, Shun Thomas, Arthur Vardaman, and Sheldon Watts filed the instant Complaint, joining their individual claims against Defendants.

### *Arnold v. DIRECTV*

90.    Plaintiff Marcus Simpson previously filed a consent to become a party plaintiff in *Arnold v. DIRECTV*, No. 10-0352-JAR, a conditionally certified collective action, pending in the Eastern District of Missouri. Pursuant to a Proposed Case Management Plan and Amended Case Management Order (Docs. 200, 216), the court dismissed without prejudice the claims of certain opt-in plaintiffs who did not fit into a subclass, (Doc. 220), to

pursue the individual claims raised herein, and ordered the statute of limitations for each opt-in plaintiff to continue to be tolled for 90 days from the date of the order. *Arnold v. DIRECTV*, Case No. 10-0325-JAR (E.D. Mo.) (Docs. 221, 244).[5]

91.    Within the 90 days granted by the *Arnold* court, Plaintiff Marcus Simpson joined his individual claims in this action.

### PLAINTIFFS' CLAIMS

**Bobby Banks**

92.    Plaintiff Bobby Banks is an individual residing in the state of Mississippi. Although Bobby Banks was treated as an independent contractor, under the FLSA he was employed by DIRECTV.

93.    In virtually every workweek between approximately March 2011 and the present, Bobby Banks worked more than 40 hours per week as a technician for DIRECTV, Coastal Installations and Next Solution in the state of Mississippi, and was unlawfully deprived of overtime compensation.[6]

94.    In fact, Bobby Banks spent approximately 60 to 80 hours per week performing tasks for the benefit of DIRECTV. Of those 60 to 80 hours, 20 to 40 hours were spent working for DIRECTV's benefit on tasks not assigned a piece rate and which were thus unpaid.

---

[5]  Plaintiff Marcus Simpson is not identified on the list of opt-in plaintiffs dismissed from *Arnold* because certain of his claims – those for time served as a W-2 employee of DIRECTV Home Services, and not for time claimed herein – remain active in *Arnold*.

[6] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

95.     Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often between $100 and $150 per week, failing to compensate Bobby Banks for all hours worked, and failing to reimburse Bobby Banks's necessary business expenses averaging $1800 to $2200 per month) resulted in further unlawful reduction of Bobby Banks' compensation.

96.     Bobby Banks does not have all the documents or records possessed by DIRECTV that bear on his damages. Based on his recollection, Bobby Banks estimates that, in a given workweek, he would work 70 hours, 30 hours of which were unpaid; he would be subject to chargebacks of $125 per week; and would be paid $900, which would be reduced by unreimbursed business expenses of $500 per week.

97.     Bobby Banks brings claims against DIRECTV.

**Timothy Dogan**

98.     Plaintiff Timothy Dogan is an individual residing in the state of Mississippi. Although Timothy Dogan was treated as an independent contractor, under the FLSA he was employed by DIRECTV.

99.     In virtually every workweek between approximately 2009 and 2012, Timothy Dogan worked more than 40 hours per week as a technician for DIRECTV, Rudder, B.B.I., and Wise Owl Communications in the state of Mississippi, and was unlawfully deprived of overtime compensation.[7]

---

[7] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

100.    In fact, Timothy Dogan spent in excess of 80 hours per week performing tasks for the benefit of DIRECTV. Of those 80+ hours, 40 to 50 hours were spent working for DIRECTV's benefit on tasks not assigned a piece rate and which were thus unpaid.

101.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often between $250 and $300 per week, failing to compensate Timothy Dogan for all hours worked, and failing to reimburse Timothy Dogan's necessary business expenses averaging $1200 per month) resulted in further unlawful reduction of Timothy Dogan's compensation.

102.    Timothy Dogan does not have the documents or records possessed by DIRECTV that bear on his damages. Based on his recollection, Timothy Dogan estimates that, in a given workweek, he would work 80 hours, 45 hours of which were unpaid; he would be subject to chargebacks of $275 per week; and would be paid $800 per week, which would be reduced by unreimbursed business expenses of $400 per week.

103.    Timothy Dogan brings claims against DIRECTV.

**Zangerio Dogan**

104.    Plaintiff Zangerio Dogan is an individual residing in the state of Tennessee. Although Zangerio Dogan was treated as an independent contractor, under the FLSA he was employed by DIRECTV and Multiband.

105.    In virtually every workweek between approximately February 2011 and March 2013, Zangerio Dogan worked more than 40 hours per week as a technician for

DIRECTV, Multiband, and Protek TV in the state of Mississippi, and was unlawfully deprived of overtime compensation.[8]

106.   In fact, Zangerio Dogan spent approximately 75 to 80 hours per week performing tasks for the benefit of Defendants. Of those 75 to 80 hours, 20 to 25 hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

107.   Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often between $50 and $100 per week, failing to compensate Zangerio Dogan for all hours worked, and failing to reimburse Zangerio Dogan's necessary business expenses averaging $1000 per week) resulted in further unlawful reduction of Zangerio Dogan's compensation.

108.   Zangerio Dogan does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Zangerio Dogan estimates that, in a given workweek, he would work 78 hours, 27 hours of which were unpaid; he would be subject to chargebacks of $75 per week; and would be paid $1400 per week, which would be reduced by unreimbursed business expenses of $250 per week.

109.   Zangerio Dogan brings claims against DIRECTV and Multiband.

**William Frazier**

110.   Plaintiff William Frazier is an individual residing in the state of Tennessee. Although William Frazier was treated as an independent contractor, under the FLSA he was employed by DIRECTV and Multiband.

---

[8] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

111.    In virtually every workweek between approximately December 2008 and the present, William Frazier worked more than 40 hours per week as a technician for DIRECTV, Multiband, Directech SW, Dish Pro, HS Experts, Coastal Installations, Next Solution, and Industrial Installations primarily in the state of Mississippi, and also in Tennessee, and was unlawfully deprived of overtime compensation.[9]

112.    In fact, William Frazier spent approximately 40 to 60 hours per week performing tasks for the benefit of Defendants. Of those 40 to 60 hours, 30 hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

113.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often between $50 and $100 per week,[10] failing to compensate William Frazier for all hours worked, and failing to reimburse William Frazier's necessary business expenses averaging $2240 per month) resulted in further unlawful reduction of William Frazier's compensation.

114.    William Frazier does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, William Frazier estimates that, in a given workweek, he would work 50 hours, 30 hours of which were unpaid; he would be subject to chargebacks of $75 per week; and would be paid $825 per week, which would be reduced by unreimbursed business expenses of $560 per week.

---

[9] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

[10] An exception to chargebacks was the workweeks when William Frazier worked for DIRECTV and HD Experts.

115.    William Frazier brings claims against DIRECTV and Multiband.

**Eric Gomez**

116.    Plaintiff Eric Gomez is an individual residing in the state of Mississippi. Although Eric Gomez was treated as an independent contractor, under the FLSA he was employed by DIRECTV and Multiband.

117.    In virtually every workweek between approximately January 2009 and February 2012, Eric Gomez worked more than 40 hours per week as a technician for DIRECTV, Multiband, Directech SW, and Dish Pro in the state of Mississippi, and was unlawfully deprived of overtime compensation.[11]

118.    In fact, Eric Gomez spent approximately 70 to 80 hours per week performing tasks for the benefit of Defendants. Of those 70 to 80 hours, 50 hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

119.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often between $60 and $75 per week, failing to compensate Eric Gomez for all hours worked, and failing to reimburse Eric Gomez' necessary business expenses averaging $900 to $1500 per month) resulted in further unlawful reduction of Eric Gomez' compensation.

120.    Eric Gomez does not have the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Eric Gomez estimates that, in a given workweek, he would work 75 hours, of which 50 hours were unpaid; he would

---

[11] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

be subject to chargebacks of $68 per week; and would be paid $950 per week, which would be reduced by unreimbursed business expenses of $300 per week.

121.    Eric Gomez brings claims against DIRECTV and Multiband.

**Richard Phillips**

122.    Plaintiff Richard Phillips is an individual residing in the state of Mississippi. For a period of time, between July 2009 and August 2010, Richard Phillips was treated as a W-2 technician; for other periods of time, between October 2011 and December 2011, he was treated as an independent contractor. For all of his time working as a technician, under the FLSA he was employed by DIRECTV.

123.    In virtually every workweek between approximately July 2009 and December 2011, Richard Phillips worked more than 40 hours per week as a technician for DIRECTV, Multiband, Directech SW, and Buccaneer Communications in the state of Mississippi, and was unlawfully deprived of overtime compensation.[12]

124.    In fact, Richard Phillips spent approximately 45 to 50 hours per week performing tasks for the benefit of Defendants. Of those 45 to 50 hours, 5 to 10 hours were spend working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

125.    Defendants' employment policies and practices detailed herein (*i.e.*, failing to compensate Richard Phillips for all hours worked and failing to reimburse Richard Phillips'

---

[12] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise. Specifically, Richard Phillips has a gap in his DIRECTV employment from about September 2010 to October 2011.

necessary business expenses of $460 to $475 per month[13]) resulted in further unlawful reduction of Richard Phillips' compensation.

126.    Richard Phillips does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Richard Phillips estimates that, in a given workweek, he would work 48 hours, 8 hours of which were unpaid and he would be paid $750 per week, which would be reduced by unreimbursed business expenses of $117 per week.

127.    Richard Phillips brings claims against DIRECTV and Multiband.

**Aric Riley**

128.    Plaintiff Aric Riley is an individual residing in the state of Mississippi. Although Aric Riley was treated as an independent contractor, under the FLSA he was employed by DIRECTV.

129.    In virtually every workweek between approximately December 2010 and the present, Aric Riley worked more than 40 hours per week as a technician for DIRECTV, Coastal Installations, and Next Solution in the state of Mississippi, and was unlawfully deprived of overtime compensation.

130.    In fact, Aric Riley spent approximately 55 to 60 hours per week performing tasks for the benefit of DIRECTV. Of those 55 to 60 hours, 12 to 15 hours were spent working for DIRECTV's benefit on tasks not assigned a piece rate and which are thus unpaid.

---

[13] Exception to unreimbursed business expenses were the workweeks when Richard Phillips worked as a W-2 employee for DIRECTV and Multiband.

131.   Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often $50 per week, failing to compensate Aric Riley for all hours worked, and failing to reimburse Aric Riley's necessary business expenses averaging $840 to $925 per month) resulted in further unlawful reduction of Aric Riley's compensation.

132.   Aric Riley does not have all the documents or records possessed by DIRECTV that bear on his damages. Based on his recollection, Aric Riley estimates that, in a given workweek, he would work 58 hours, 14 hours of which were unpaid; he would be subject to chargebacks of $50 per week; and would be paid $1,000 per week, which would be reduced by unreimbursed business expenses of $221 per week.

133.   Aric Riley brings claims against DIRECTV.

**Christopher Roberts**

134.   Plaintiff Christopher Roberts is an individual residing in the state of Mississippi. Although Christopher Roberts was treated as an independent contractor, under the FLSA he was employed by DIRECTV.

135.   In virtually every workweek between approximately September 2011 and May 2012, Christopher Roberts worked more than 40 hours per week as a technician for DIRECTV and Coastal Installations primarily in the state of Mississippi, and was unlawfully deprived of overtime compensation.[14]

136.   In fact, Christopher Roberts spent approximately 72 hours per week performing tasks for the benefit of DIRECTV. Of those 72 hours, 32 hours were spent

---

[14] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise. Specifically, Christopher Roberts has a gap in his DIRECTV employment in January 2012.

working for DIRECTV's benefit on tasks not assigned a piece rate and which were thus unpaid.

137.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but averaging $50 each, failing to compensate Christopher Roberts for all hours worked, and failing to reimburse Christopher Roberts's necessary business expenses averaging $1400 per month) resulted in further unlawful reduction of Christopher Roberts' compensation.

138.    Christopher Roberts does not have the documents or records possessed by DIRECTV that bear on his damages. Based on his recollection, Christopher Roberts estimates that, in a given workweek, he would work 72 hours, 32 hours of which were unpaid; he would be subject to chargebacks of $5 per week; and would be paid $300 per week, which would be reduced by unreimbursed business expenses of $350 per week.

139.    Christopher Roberts brings claims against DIRECTV.

**Van Roden**

140.    Plaintiff Van Roden is an individual residing in the state of Mississippi. Although Van Roden was treated as an independent contractor, under the FLSA he was employed by DIRECTV.

141.    In virtually every workweek between approximately 2008 and December 2013, Van Roden worked more than 40 hours per week as a technician for DIRECTV, Media Net LLC, and White Communications primarily in the state of Mississippi, and also in Louisiana, and was unlawfully deprived of overtime compensation.[15]

---

[15] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise. Specifically, Van Roden has a gap in his DIRECTV employment from about December 2012 to January 2013.

142.    In fact, Van Roden in excess of 70 hours per week performing tasks for the benefit of DIRECTV. Of those 70 hours, 21 to 30 hours were spent working for DIRECTV's benefit on tasks not assigned a piece rate and which were thus unpaid.

143.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often between $50 and $100 per week,[16] failing to compensate Van Roden for all hours worked, and failing to reimburse Van Roden's necessary business expenses averaging $1100 to $1180 per month) resulted in further unlawful reduction of Van Roden's compensation.

144.    Van Roden does not have all the documents or records possessed by DIRECTV that bear on his damages. Based on his recollection, Van Roden estimates that, in a given workweek, he would work about 70 hours, 26 hours of which were unpaid; he would be subject to chargebacks of $75 per week; and would make $1100, which would be reduced by unreimbursed business expenses of $285 per week.

145.    Van Roden brings claims against DIRECTV.

**Ricky Romines**

146.    Plaintiff Ricky Romines is an individual residing in the state of Mississippi. For periods of time, between July 2011 and July 2012 and September 2012 and March 2013, Ricky Romies was treated as an independent contractor; for other periods of time, between July 2012 and September 2012, he was treated as a W-2 technician. For all of his time working as a technician, under the FLSA he was employed by DIRECTV

---

[16] An exception to chargebacks was the workweeks when Van Roden worked for White Communications and DIRECTV.

147.    In virtually every workweek between approximately July 2011 and March 2013, Ricky Romines worked more than 40 hours per week as a technician for DIRECTV, Wise Owl Communications, and Coastal Installations in the state of Mississippi, and was unlawfully deprived of overtime compensation.[17]

148.    In fact, Ricky Romines spent approximately 75 hours per week performing tasks for the benefit of DIRECTV. Of those 75 hours, 25 hours were spent working for DIRECTV's benefit on tasks not assigned a piece rate and which were thus unpaid.

149.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often $50 per week, failing to compensate Ricky Romines for all hours worked, and failing to reimburse Ricky Romines' necessary business expenses averaging $1490 to $1590 per month[18]) resulted in further unlawful reduction of Ricky Romines' compensation.

150.    Ricky Romines does not have all the documents or records possessed by DIRECTV that bear on his damages. Based on his recollection, Ricky Romines estimates that, in a given workweek, he would work about 75 hours, 25 hours of which were unpaid; he would be subject to chargebacks of $50 per week; and would be paid $450 per week, which would be reduced by unreimbursed business expenses of $385 per week.

151.    Ricky Romines brings claims against DIRECTV.

---

[17] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

[18] Exceptions to chargebacks and unreimbursed business expenses were the workweeks when Ricky Romines worked as a W-2 technician for Wise Owl Communications and DIRECTV.

**Larry Sanders**

152.   Plaintiff Larry Sanders is an individual residing in the state of Mississippi. Although Larry Sanders was treated as an independent contractor, under the FLSA he was employed by DIRECTV.

153.   In virtually every workweek between approximately September 2007 and September 2013, Larry Sanders worked more than 40 hours per week as a technician for DIRECTV, Rudder, B.B.I., Coastal Installations, and Synergy in the state of Mississippi, and was unlawfully deprived of overtime compensation.[19]

154.   In fact, Larry Sanders spent approximately 48 to 70 hours per week performing tasks for the benefit of DIRECTV. Of those 48 to 70 hours, 20 hours were spent working for DIRECTV's benefit on tasks not assigned a piece rate and which were thus unpaid.

155.   Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often between $42 and $135 per week, failing to compensate Larry Sanders for all hours worked, and failing to reimburse Larry Sanders' necessary business expenses averaging $970 to $1052 per month) resulted in further unlawful reduction of Larry Sanders' compensation.

156.   Larry Sanders does not have all the documents or records possessed by DIRECTV that bear on his damages. Based on his recollection, Larry Sanders estimates that, in a given workweek, he would work 59 hours, 20 hours of which were unpaid; he would

---

[19] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

be subject to chargebacks of $89 per week; and would be paid $850 per week, which would be reduced by unreimbursed business expenses of $253 per week.

157.     Larry Sanders brings claims against DIRECTV.

**Emmanuel Stallworth**

158.     Plaintiff Emmanuel Stallworth is an individual residing in the state of Mississippi. Although Emmanuel Stallworth was treated as an independent contractor, under the FLSA he was employed by DIRECTV.

159.     In virtually every workweek between approximately 2008 and October 2014, Emmanuel Stallworth worked more than 40 hours per week as a technician for DIRECTV, Stars & Stripes, Media Net LLC, and Southern Satellite Team, LLC in the state of Mississippi, and was unlawfully deprived of overtime compensation.[20]

160.     In fact, Emmanuel Stallworth spent approximately 70 to 80 hours per week performing tasks for the benefit of DIRECTV. Of those 70 to 80 hours, 30 to 40 hours were spent working for DIRECTV's benefit on tasks not assigned a piece rate and which were thus unpaid.

161.     Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often between $75 and $150 per week, failing to compensate Emmanuel Stallworth for all hours worked, and failing to reimburse Emmanuel Stallworth's necessary business expenses averaging $1020 to $1320 per month) resulted in further unlawful reduction of Emmanuel Stallworth's compensation.

---

[20] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

162.    Emmanuel Stallworth does not have all the documents or records possessed by DIRECTV that bear on his damages. Based on his recollection, Emmanuel Stallworth estimates that, in a given workweek, he would work 75 hours, 35 hours of which were unpaid; he would be subject to chargebacks of $113 per week; and would be paid $825 per week, which would be reduced by unreimbursed business expenses of $293 per week.

163.    Emmanuel Stallworth brings claims against DIRECTV.

**Shun Thomas**

164.    Plaintiff Shun Thomas is an individual residing in the state of Alabama. Although Shun Thomas was treated as an independent contractor, under the FLSA he was employed by DIRECTV.

165.    In virtually every workweek between approximately September 2009 and October 2012, Shun Thomas worked more than 40 hours per week as a technician for DIRECTV, Washington Communications, United Communications, and Media Net LLC primarily in the state of Mississippi, and also in Louisiana and Alabama, and was unlawfully deprived of overtime compensation.[21]

166.    In fact, Shun Thomas spent in excess of 70 hours per week performing tasks for the benefit of DIRECTV. Of those 70+ hours, 25 to 30 hours were spent working for DIRECTV's benefit on tasks not assigned a piece rate number and which were thus unpaid.

167.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often between $50 and $100 per week, failing to compensate Shun Thomas for all hours worked, and failing to reimburse Shun Thomas'

---

[21] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

necessary business expenses averaging $1720 per month) resulted in further unlawful reduction of Shun Thomas' compensation.

168.   Shun Thomas does not have all the documents or records possessed by DIRECTV that bear on his damages. Based on his recollection, Shun Thomas estimates that, in a given workweek, he would work 70 hours, 28 hours of which were unpaid; he would be subject to chargebacks of $75 per week; and would be paid $1100, which would be reduced by unreimbursed business expenses of $430 per week.

169.   Shun Thomas brings claims against DIRECTV.

**Arthur Vardaman**

170.   Plaintiff Arthur Vardaman is an individual residing in the state of Mississippi. Although Arthur Vardaman was treated as an independent contractor, under the FLSA he was employed by DIRECTV.

171.   In virtually every workweek between approximately May 2010 and May 2012, Arthur Vardaman worked more than 40 hours per week as a technician for DIRECTV, Wise Owl Communications, and Coastal Installations, in the state of Mississippi, and was unlawfully deprived of overtime compensation.[22]

172.   In fact, Arthur Vardaman spent approximately 60 hours per week performing tasks for the benefit of DIRECTV. Of those 60 hours, 25 hours were spent working for DIRECTV's benefit on tasks not assigned a piece rate and which were thus unpaid.

173.   Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often between $100 and $150 per week, failing to

---

[22] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

compensate Arthur Vardaman for all hours worked, and failing to reimburse Arthur Vardaman's necessary business expenses averaging $1138 to $1243 per month) resulted in further unlawful reduction of Arthur Vardaman's compensation.

174.    Arthur Vardaman does not have all the documents or records possessed by DIRECTV that bear on his damages. Based on his recollection, Arthur Vardaman estimates that, in a given workweek, he would work 60 hours, 25 hours of which were unpaid; he would be subject to chargebacks of $75 per week; and would be paid $1000 per week, which would be reduced by unreimbursed business expenses of $298 per week.

175.    Arthur Vardaman brings claims against DIRECTV.

**Sheldon Watts**

176.    Plaintiff Sheldon Watts is an individual residing in the state of Alabama. Although Sheldon Watts was treated as an independent contractor, under the FLSA he was employed by DIRECTV.

177.    In virtually every workweek between approximately October 2010 and April 2011, Sheldon Watts worked more than 40 hours per week as a technician for DIRECTV and Media Net LLC in the state of Mississippi, and was unlawfully deprived of overtime compensation.[23]

178.    In fact, Sheldon Watts spent approximately 60 hours per week performing tasks for the benefit of DIRECTV. Of those 60 hours, 20 hours were spent working for the benefit of DIRECTV on tasks not assigned a piece rate and which are thus unpaid.

---

[23] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

179.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" averaging $60 each, failing to compensate Sheldon Watts for all hours worked, and failing to reimburse Sheldon Watts' necessary business expenses averaging $1080 to $1280 per month) resulted in further unlawful reduction of Sheldon Watts' compensation.

180.    Sheldon Watts does not have the documents or records possessed by DIRECTV that bear on his damages. Based on his recollection, Sheldon Watts estimates that, in a given workweek, he would work 60 hours, 20 hours of which were unpaid; he would be subject to chargebacks of $11 per week; and would be paid $600 per week, which would be reduced by unreimbursed business expenses of $395 per week.

181.    Sheldon Watts brings claims against DIRECTV.

**Marcus Simpson**

182.    Plaintiff Marcus Simpson is an individual residing in the state of Mississippi. For a period of time, between February 2009 and May 2013, Marcus Simpson was treated as a W-2 technician; for another period of time, between August 2013 and the present, he was treated as an independent contractor. For all of his time working as a technician, under the FLSA he was employed by DIRECTV and Multiband.

183.    In virtually every workweek between approximately September 2009 and the present, Marcus Simpson worked more than 40 hours per week as a technician for DIRECTV and JP&D Digital Satellite, Multiband, E-Connect, Wise Connect, and White

Communications in the state of Mississippi, and was unlawfully deprived of overtime compensation.[24]

184.    In fact, Marcus Simpson spent approximately 60 to 80 hours per week performing tasks for the benefit of Defendants. Of those 60 to 80 hours, 20 to 30 hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

185.    Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often between $25 and $50 per week, failing to compensate Marcus Simpson for all hours worked, and failing to reimburse Marcus Simpson's necessary business expenses averaging $1516 per month) resulted in further unlawful reduction of Marcus Simpson's compensation.

186.    Marcus Simpson does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Marcus Simpson estimates that, in a given workweek, he would work 70 hours, 25 hours of which were unpaid; he would be subject to chargebacks of $38 per week; and would be paid $675 per week, which would be reduced by unreimbursed business expenses of $379 per week.

187.    Marcus Simpson brings claims against DIRECTV and Multiband.

## COUNT I

### Violation of the Fair Labor Standards Act of 1938
*By each Plaintiff individually against Plaintiff's previously identified joint-employer-Defendant(s)*

188.    Plaintiffs re-allege all allegations set forth above.

---

[24] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

189.   At all times material herein, Plaintiffs have been entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. §§ 201, *et seq.*

190.   The FLSA regulates, among other things, the payment of overtime pay by employers whose employees are engaged in interstate commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce. 29 U.S.C. § 207(a)(1).

191.   The FLSA also regulates, among other things, the payment of minimum wage by employers whose employees are engaged in interstate commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce.  29 U.S.C. § 206(a).

192.   Defendants are subject to the minimum wage and overtime pay requirements of the FLSA because they are enterprises engaged in interstate commerce and their employees are engaged in commerce.

193.   Defendants violated the FLSA by failing to pay all minimum wage and overtime wages due to Plaintiffs,[25] failing to properly calculate Plaintiffs' regular rate of pay for determining the overtime premium pay owed, and improperly deducting money from Plaintiffs' pay.

194.   As to defendant DIRECTV, Plaintiffs are entitled to damages equal to the mandated and unpaid minimum wage and overtime premium pay within the three years

---

[25] In its Order of August 31, 2015, the Court dismissed the minimum wage claims of Plaintiffs Zanerio Dogan, Richard Phillips, Aric Riley, Van Roden, A. Vardamann, Larry Sanders, Shun Thomas, and Eric Gomez.  *See* Mem. and Order (Doc. 38).  These plaintiffs do not reassert minimum wage claims herein and where the word "Plaintiffs" refers to minimum wage claims, it should not be read to include these individuals.

preceding the filing their consent to join forms in the *Lang* or *Arnold* litigation,[26] plus periods of equitable tolling,[27] because DIRECTV acted willfully and knew or showed reckless disregard in its violation of the FLSA.

195.    Plaintiffs with claims against Multiband are entitled to damages equal to the mandated and unpaid minimum wage and overtime premium pay within the three years preceding the filing of (1) the original complaint in *Acfalle*, No. 13-8108, *i.e.*, November 1, 2013[28] or (2) this original complaint, filed October 21, 2014,[29] plus periods of equitable tolling, because Multiband acted willfully and knew or showed reckless disregard in its violation of the FLSA.

196.    Pursuant to Defendants' policies and practices, Defendants willfully violated the FLSA by refusing and failing to pay Plaintiffs overtime and minimum wages. In the course of perpetrating these unlawful practices, Defendants willfully failed to keep accurate records of all hours worked by, compensation paid to, and expenses incurred by Plaintiffs.

197.    Defendants' unlawful conduct was willful because, among other reasons described herein, DIRECTV, Multiband, and other members of the Provider Network knew, or should have known, that the fissured employment scheme utilized a piece-rate

---

[26] Or from the date of filing the original *Acfalle* complaint, November 1, 2013, for Plaintiff Zangerio Dogan. Or from the date of filing the amended *Acfalle* complaint, December 23, 2013, for Plaintiff Aric Riley.

[27] Former *Arnold* Plaintiff Marcus Simpson is entitled to an additional six months of tolling on his claims against DIRECTV per the law of the case. The *Arnold* court ordered a period of tolling on the running of the opt-ins' limitations period during a discovery stay while DIRECTV's motion to dismiss was pending. (*Arnold* Docs 46, 49). The period of tolling was 180 days, which, added to the applicable three year period gives former *Arnold* Plaintiff's claims against DIRECTV a three-and-a-half year lookback from the date each opt-in joined that action.

[28] Plaintiffs Zangerio Dogan, William Frazier, Eric Gomez, and Richard Phillips.

[29] Plaintiff Marcus Simpson.

system(s) that unlawfully denied Plaintiffs minimum wage, overtime wage, and other employment benefits. Those systems have been challenged in numerous lawsuits around the country in which DIRECTV, as well as other HSP members of DIRECTV's Provider Network, have all been defendants. Indeed DIRECTV is currently a defendant in a lawsuit brought by the U.S. Department of Labor in the United States District Court for the Western District of Washington challenging DIRECTV's (1) status as an employer of technicians like the plaintiffs herein and (2) the piece-rate compensation system. The system being challenged in that case is essentially identical to the system(s) being challenged in this case.

198.  Defendant Multiband knew, or showed disregard as to whether, its conduct was prohibited by statute. Multiband has been investigated at least twice by the U.S. Department of Labor ("DOL") for violations of the FLSA. Further, Multiband's predecessor DirecTECH was investigated at least once by the DOL for FLSA record keeping violations.

199.  In an investigation covering the time period of November 5, 2007 to November 9, 2009, Multiband was found to be in violation of overtime regulations for failure to count all hours worked by piece rate workers – the same basic theory advanced in this case.   At the end of the investigation, representatives of the DOL met with representatives of Multiband and emphasized the provisions of the FLSA regarding hours worked and computation of overtime.  Multiband assured the DOL that it would comply in the future.

200.  Despite its assurances to comply with the FLSA, Multiband was again investigated by the DOL for the time period of March 29, 2010 to March 28, 2012. In this investigation, certain hours worked by piece rate technicians were excluded from the calculation of total hours worked, including time spent by technicians maintaining their

work vehicles.  Following the investigation, Multiband refused to respond to or comply with the DOL's recommendations.

201.    In addition to the above DOL investigations, Multiband and its predecessor company DirecTECH have been named in wage and hour lawsuits challenging Multiband's piece-rate pay system.  These case include, but are not limited to:

a.      *In re: DirecTECH Southwest, Inc. Fair Labor Standards Act (FLSA)*, Case No. 2:08-md-01984-SS (E.D. La.) (now settled, MDL case involving claims, like in this case) that the piece-rate pay system did not count, and therefore compensate, all hours worked by technicians); and

b.      *Edwards v. Multiband Corp.*, Case No. 10-2826 (MJD/JJK) (D. Minn) (now settled, FLSA collective action challenging Multiband's practice of paying piece-rate technicians who were improperly classified as subcontractors).

202.    Despite its litigation history and record of Department of Labor investigations, Multiband continues to improperly participate in DIRECTV's fissured employment scheme and continues to utilize the flawed piece-rate pay system, which does not pay for all work.

203.    Defendants have acted neither in good faith nor with reasonable grounds to believe that their actions and omissions were not a violation of the FLSA. As a result thereof, Plaintiffs are each entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid wages as described by Section 16(b) of the FLSA, codified at 29 U.S.C. § 216(b). Alternatively, should the Court find Defendants acted in good faith in failing to pay Plaintiffs minimum wage and overtime compensation, Plaintiffs are each entitled to an award of prejudgment interest at the applicable legal rate.

204.    As a result of these violations of the FLSA's minimum wage and overtime pay provisions, compensation has been unlawfully withheld from Plaintiffs by Defendants. Accordingly, pursuant to 29 U.S.C. § 216(b), Defendants are liable for the unpaid minimum wages and overtime premium pay along with an additional amount as liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees, and costs of this action.

205.    Plaintiffs request relief as described below and as permitted by law.

**WHEREFORE**, Plaintiffs demand a jury trial for all issues so triable, and request the Court enter judgment for Plaintiffs individually and:

a.  Award damages for unpaid minimum wages and unpaid overtime wages under 29 U.S.C. § 216(b);

b.  Award liquidated damages under 29 U.S.C. § 216(b);

c.  Award reasonable attorneys' fees under the Fair Labor Standards Act;

d.  Award costs of suit under 29 U.S.C. § 216(b);

e.  Award pre-judgment interest;

f.  Award damages including wages or other compensation lost as a result of the misclassification; and

g.  Grant any further relief that the Court may deem just and equitable.

Dated: October 1, 2015                    Respectfully submitted,

                                          /s/ Cynthia D. Burney

                              By:    _____
                                     Cynthia D. Burney
                                     **CYNTHIA D. BURNEY, ATTORNEY AT LAW**
                                     P.O. Box 3387
                                     Bay St. Louis, MS 39521
                                     228-467-5589
                                     Fax: 228/586-6069
                                     Email: cindyburney@bellsouth.net

                                     Jesse B. Hearin, III
                                     **HEARIN, LLC**
                                     La. Bar Roll No. 22422
                                     1009 Carnation Street, Suite E
                                     Slidell, Louisiana 70460
                                     Telephone:    985-639-3377
                                     Email: jbhearin@hearinllc.com

                                     Todd C. Werts, *Admitted PHV*
                                     **LEAR WERTS LLP**
                                     Mo. Bar No. 53288
                                     Email: werts@learwerts.com
                                     2003 W. Broadway, Ste. 107
                                     Columbia, Missouri 65203
                                     Telephone:    573-875-1991
                                     Facsimile:     573-875-1985
                                     *Attorneys for Plaintiffs*